**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| DWONE C. HARRISON, WILDRICK | ) | |
| S. SMITH, AND LAMARCH T. RICHARD, | ) | |
| | ) | (WO) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:04cv796-A |
| | ) | |
| CITY OF PRATTVILLE, Alabama Police | ) | |
| Department c/o JIM BYARD, JR., MAYOR; | ) | |
| LIEUTENANT TODD TOWNSON, | ) | |
| in his capacity as police officer for the city of | ) | |
| Prattville, Alabama; and | ) | |
| POLICE OFFICER BRUCE LITTLES,[1] | ) | |
| in his capacity as police officer for the City of | ) | |
| Prattville, Alabama Police Department., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

### I. <u>INTRODUCTION</u>

This case is before the court on a Motion for Summary Judgment filed by the Defendants

on August 31, 2005 (Doc. # 20).

The Plaintiffs filed a Complaint in this case, naming as Defendants the City of Prattville,

Alabama Police Department c/o Jim Byard, Jr., Mayor; Lieutenant Todd Townson, in his

capacity as police officer for the City of Prattville, Alabama; and police officer Bruce Little, in

his capacity as police officer for the City of Prattville, Alabama police department.

The Plaintiffs bring claims for constitutional violations pursuant to 42 U.S.C. § 1983

(Count I), negligence (Count II), assault and battery (Count III), and false imprisonment (Count

---

[1] Because this Defendant's name is spelled "Little" in his affidavit, the court will refer to
him as Little.

IV).  Because the Plaintiffs have asserted federal claims, the court has jurisdiction pursuant to 28

U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.

§ 1367 (a).

For the reasons to be discussed, the Motion for Summary Judgment is due to be

GRANTED.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S.

317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the

'pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

Id. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute

of material fact, or by showing, or pointing out to, the district court that the nonmoving party has

failed to present evidence in support of some element of its case on which it bears the ultimate

burden of proof. Id. at 322-324.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to

go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine

issue for trial.'" Id. at 324.  To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. See Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## III.  FACTS

The three Plaintiffs in this case bring claims stemming from three separate events.  The facts surrounding those events, viewed in a light most favorable to the non-movants, are as follows:

Meharry Street Incident

On October 31, 2003, Plaintiffs Dwone Harrison ("Harrison") and Wildrick Smith ("Smith") and a third man named Andre Green were stopped by Defendants Todd Townson ("Townson") and Bruce Little ("Little"), as well as other officers on Meharry Street in Prattville, Alabama.

The Defendants have provided undisputed evidence in the form of Little's affidavit that Andre Greene ("Greene") is an informant and had informed Little that Harrison and Smith were planning to purchase ten pounds of marijuana from a person from Texas off of Highway 31 in Prattville, Alabama.  Defendants' Exhibit 3, page 1.  Little also stated in his affidavit that Greene had provided reliable information about other individuals distributing illegal narcotics. Id.  The

Defendants have further provided evidence that Greene was a registered informant with the

Prattville Police Department to whom Little was assigned as agent.  Defendants' Exhibit 11.

On November 7, 2003, Greene contacted Little and told him that Harrison and Smith

were going to meet the individual from Texas on that date, and that they had asked Greene to

drive them. Defendants' Exhibit 3 at page 2.  Little and DEA Task Force Agent Larry Hubbard

followed Greene's vehicle on the day which Greene said was the date upon which the drug

transaction was to occur.  Little saw Greene enter a neighborhood and exit with Harrison in his

car, and then pick up Smith from his residence.  Id. Law enforcement officers were following the

vehicle when it picked up an unknown female who was carrying a bag. Id.  The unknown female

was later left at a residence just off Highway 31 with the bag.  Id.[2]  Little said that everything

Greene had previously told him about the drug deal was true.  Id.  Then, Greene drove the

vehicle toward Prattville, and made an abrupt turn, eventually turning onto a dead end street. Id.

Little testified that the agents believed Greene to be in danger because the turn was not on the

planned route.  Id.  The agents then conducted a stop.  Harrison has testified that the stop

occurred "real late at night" at "[n]ine, maybe ten."  Defendants' Exhibit 1 at page 52: 15-17.

The Plaintiffs cite Smith's deposition in which he states that the officers followed them to

the dead end street, blocked them in, made them get out of the car, put infared guns on them, and

made them lie on the ground.  Defendants' Exhibit 10, page 26:7-22.   The Plaintiffs also cite

Harrison's deposition in which he states that they were detained for about 20 minutes.

---

[2] The Plaintiffs contend that, although the Defendants have argued that they thought the
Plaintiffs had stashed money with a woman who had been an occupant of the car prior to the
stop, the woman was actually Smith's girlfriend and was going to do laundry.  There is no
evidence, however, that the officers were aware of the contents of the bag at the time of the
incident.

Defendants' Exhibit 1, page 114: 1-2.   The court has not been cited to any evidence to support either that the Plaintiffs were handcuffed or that they were required to crawl, as the Plaintiffs have argued.   The court, however, is aware of a reference to crawling 7 or 8 feet in the deposition excerpt of Harrison provided by the Defendants.   Id. at page 132: 5-8.  Also, in the excerpts of Smith's deposition provided by the Defendants, Smith states that the officers drew guns on them, searched them, put them in handcuffs, then took the handcuffs off and let them go. Defendants' Exhibit 10 at 67:10-12.   Smith states that he was not asked to crawl.   Id. at page 124: 12-14.  Smith also states that Harrison at first would not comply with the officer's order to lie on the ground and said that he only would get on his knees, but eventually laid down on the ground. Id. at page 60: 7-8.  No charges were brought against Harrison or Smith.

Rack Room Incident

The second incident which forms the basis of claims in this case occurred in January of 2004 outside of Rack Room, a Prattville business.  Plaintiff Harrison, a woman he identifies as his common law wife, and her minor son left Rack Room.  According to Harrison, the three of them were playing a game by racing to the car.  Defendants' Exhibit 1 at page 121-22.  Little has stated in an affidavit that he saw Harrison exit the store and that Harrison was acting "very evasive."  Defendants' Exhibit 3 at page 3.[3]  Harrison's version of the events is consistent with the characterization of his actions as "evasive" in that he states that after they ran to the vehicle, he tried to move forward, but that a Tahoe blocked him in, so he pulled forward and when he got to a stop sign he made "a right, and hit a left, and I'm gone on jumping in the median and going

---

[3] Little also testified that Harrison nearly struck the officer's Tahoe, but because Harrison disputes that fact, the court has not considered it.

on to Montgomery where I was going."   Defendants' Exhibit 1 at page 122: 1-4, 123: 14-17.

Harrison "drove up the road," and "by that time he made it around and put the lights on me." Id.

at 122: 8-10.

Little has testified in his affidavit that he was familiar with Harrison and knew that he did

not have a valid driver's license and that Harrison is known to be dangerous.  Defendants'

Exhibit 3 at pages 3.

Harrison admitted that he did not have a driver's license. Defendants' Exhibit 1 at page

122: 21-2. According to Harrison, the officers asked him at gun point about guns and money,

then asked to see what was in the bag and examined Harrison's receipt for purchase.  Id. at page

123:23-124:10.  Harrison also states that the officers asked where Harrison's gun was and looked

under the driver's seat, but did not search the woman or child or order them out of the car. Id. at

121: 4-12.  He claims to have suffered an exacerbation of existing mental conditions as a result

of this and the October Meharry Street encounter.[4]

<u>Alice Lane Incident</u>

The final incident which forms the basis of the Plaintiffs' claims occurred in February

2004 on Alice Lane, and involved only Plaintiff Wildrick Richard ("Richard").  Richard was

---

[4] The Defendants' version of the events in question varies greatly from Harrison's in that they state that Harrison crouched behind a car they knew was not his before he ran to his own vehicle.  Harrison denies that this occurred, however, so for purposes of resolving the motion for summary judgment, the court accepts as fact that Harrison ran from the store directly to his vehicle.  Little also testifies that guns were never drawn and that there was no mention of drugs or money.  Although not cited to the court by the Plaintiffs, in the deposition excerpt provided to the court by the Defendants, Harrison does mention that the boy saw guns during the Rack Room incident.  Defendants' Exhibit 1 at page 81:2-5.  Harrison also testified that he was asked about drugs and money.  Id. at page 123-24.  Therefore, the court accepts as fact that at some point during the Rack Room incident guns were drawn and that Harrison was questioned about drugs and money.

followed by law enforcement officers to a neighborhood where he exited his car and was eventually stopped by the officers. Richard asserts that the officers shot at him. In pages of his deposition cited to by the Plaintiffs, however, Richard testified that he knew shots were fired, and that the shots sounded like pistol shots, but he did not know what kind of gun it was. Defendants' Exhibit 2 at page 27:9-14. Richard also states that he was told that a Mike Day had told the officers that Richard had shot into Todd Townson's house. Id. at page 26:4-5.

The Defendants have provided unrefuted evidence in Townson's affidavit that the February stop came during an attempt to arrest Richard on an active felony warrant for intimidating a witness and to question him regarding a shooting into Townson's house. Defendants' Exhibit 4 at page 1. Townson also states in his affidavit that he followed Richard in a marked police car and activated his emergency lights. Id. Richard refused to stop and, after a high speed chase, exited his vehicle and began to run. Id. Townson states that Richard was considered armed and dangerous because of the intimidation charge and because he was a suspect in a shooting case. Id. Townson's unrefuted evidence is that he put chemical spray in the air using an air rifle. Id. Townson further states that once Richard was stopped, he determined that Richard had not shot into his house, and that Richard was released despite the outstanding warrant because he cooperated with the police department in determining who shot into the house. Id. at page 2.

The Defendants have also provided the affidavit of Little in which he states that an informant, James Day, told the police department that Richard and Harrison planned to shoot into Townson's house and that Richard had asked to buy weapons from Day. Defendants' Exhibit 3 at page 4. The Plaintiffs characterize James Day as "unreliable" in their brief, but cite

no evidence to support this characterization.  Little states that when he and Townson attempted

to stop Richard, Richard failed to yield to emergency lights and drove at high speeds.  Id.  Little

also states that when Richard left his car and began to run, Townson ejected chemical spray in

the air using an air gun, but Richard still failed to stop. Id.

## IV. **DISCUSSION**

The Defendants have moved for summary judgment on all claims.  The court will first

address the Plaintiffs' federal claims, and then will address the claims asserted under state law.

### Federal Claims

It is not clear from the face of the Complaint that the Plaintiffs intended to bring claims

against any individual defendants in any capacity other than their official capacities, because the

Complaint is styled in terms of the individual Defendants' official positions. The Defendants,

however, have moved for summary judgment on the basis of qualified immunity, as well as a

lack of a policy or custom for municipal liability.  Accordingly, the court will first address

federal claims which may have been asserted against individuals, and then will address the basis

for any municipal liability.

### A.  Fourth Amendment

1.  Claims Against Defendants Little and Townson in Their Individual Capacities[5]

As stated above, the Defendants have asserted the defense of qualified immunity on

behalf of the individual Defendants.  Qualified immunity is a protection designed to allow

government officials to avoid the expense and disruption of trial. Ansley v. Heinrich, 925 F.2d

---

[5] There is apparently no contention that Mayor Jim Byard has been sued in his individual
capacity.

1339, 1345 (11th Cir.1991).  As a preliminary matter, the court must determine whether the public official was acting within the scope of his discretionary authority at the time the allegedly wrongful acts occurred.  See Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir. 1988).  There is no dispute that the officers were acting within their discretionary authority in this case.

Once it is established that a defendant was acting within his discretionary authority, the court must determine whether "[t]aken in a light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001).  "[I]f a constitutional right would have been violated under the plaintiff's version of the facts," the court must then determine "whether the right was clearly established." Wood v. Kesler  323 F.3d 872, 878 (11th Cir. 2003).

Requiring that a constitutional right be clearly established means that liability only attaches if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  United States v. Lanier, 520 U.S. 259, 270 (1997).  In other words, a defendant is entitled to "fair warning" that his conduct deprived his victim of a constitutional right. Hope v. Pelzer, 536 U.S. 730, 741 (2002).

The discussion of the Fourth Amendment claims is divided into the three specific instances, the facts of which have been set out above.[6]

a.  October 2003 Meharry Street Incident

_____

[6]  In their brief in opposition to the Motion for Summary Judgment, the Plaintiffs state that the lawsuit "primarily" arises from three separate incidents, but that the Plaintiffs have collectively been harassed and racially profiled during the bulk of their adult lives, referring to charges as to which the Plaintiffs were acquitted.  Plaintiffs' Memorandum in Opposition at page 2. There is no claim based on such a theory asserted in the Complaint filed in this case, however. Complaint (Doc. #1) (asserting claims based on three discrete incidents).

The Plaintiffs apparently have asserted both unlawful seizure and unlawful use of force claims against the Defendants based on the Meharry Street incident.  The court will address each of these claims in turn.

Unlawful Seizure

A law enforcement officer may conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that there is criminal activity.  Terry v. Ohio, 392 U.S. 1, 30 (1968).  Drawing a weapon and ordering a person to lie on the ground does not convert an investigatory stop into an arrest.  Courson v. McMillian, 939 F.2d 1479, 1493 (11th Cir. 1991).  Although reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000).

The Plaintiffs state that Harrison and Smith were stopped only because the Defendants did not follow through with investigating information provided by their informant.  The Defendants respond that Little and Townson had reasonable suspicion that criminal activity was occurring because Greene had informed them that Harrison and Smith were planning to purchase ten pounds of marijuana from a person from Texas and that they were in fact investigating this information when the stop occurred.  Defendants' Exhibit 3, page 1.

The Supreme Court has given some guidance as to the evaluation of the reasonableness of a stop based on an informant's information.  In Adams v. Williams, 407 U.S. 143, 147 (1972), the court explained that an informant personally known to an officer who had provided information in the past provides a stronger justification for a stop than does an anonymous

10

telephone tip.  The court stated that when a credible informant warns of a specific impending crime, the police may take an appropriate response.  Id.

In this case, the evidence provided by the Defendants as to Greene's involvement as an informant is undisputed by the Plaintiffs, other than their characterization of him attempting to protect himself from prosecution and as being misguided.  According to the undisputed evidence before the court, however, Greene was a registered informant, had provided reliable information about others selling narcotics, and many details of his information about the impending drug sale were verified as law enforcement agents followed Greene's vehicle.  The court concludes, therefore, that the stop of Smith and Harrison was based upon reasonable suspicion, and summary judgment is due to be GRANTED on this claim.

Alternatively, Smith and Harrison are entitled to qualified immunity.  When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had "arguable" reasonable suspicion to support an investigatory stop. Jackson v. Sauls, 206 F.3d 1156, 1165 -1166 (11th Cir. 2000).  Based on the reliable informant's information and the fact that much of the information he had given them had been verified, the officers had arguable reasonable suspicion to conduct a stop.  Summary judgment is, therefore, due to be GRANTED as to the individual officers on this alternative basis.

Unlawful Force

The Plaintiffs also contend that the officers' actions in detaining them were unreasonable use of force.

A claim that law enforcement officers have used excessive force in the course of a seizure is analyzed under the Fourth Amendment reasonableness standard.  See Graham v.

11

Connor, 490 U.S. 386 (1989).  Reasonableness is judged from the perspective of a reasonable officer on the scene. Id. at 396.

The court has already concluded that the Plaintiffs have failed to create a question of fact as to the reasonableness of the initial stop.  "The right to make an investigatory stop carries with it the right to use some degree of physical coercion on threat thereof to effect it." Jackson v. Sauls, 206 F.3d 1156, 1172 (11th Cir. 2000).  Determining whether the degree of force used was reasonable "requires consideration of the exigencies of the immediate situation and the officers' being forced to make split-second decisions." Id. at 1171.  To balance the necessity of the use of force used against a detainee's constitutional rights, a court must evaluate several factors, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  Vinyard v. Wilson  311 F.3d 1340, 1347 (11th Cir. 2002).

The Eleventh Circuit has explained that an officer's drawing a weapon and ordering a person to lie on the ground does not necessarily constitute excessive force.  Jackson, 206 F.3d at 1172.  The Eleventh Circuit has outlined the case law regarding use of force during Terry stops as follows:

> Police may take reasonable action, based upon the circumstances, to protect themselves during these encounters, or to maintain the status quo. See Hensley, 105 S.Ct. at 684 (reasonable for one police officer approaching vehicle containing two men, one of whom he suspected was wanted for an armed robbery committed six days earlier, to draw his gun); United States v. Taylor, 716 F.2d 701, 707-09 (9th Cir.1983) (armed approach by two agents reasonable where suspects were considered dangerous; handcuffing of one suspect justified in a Terry stop when suspect twice disobeyed order to raise hands and made furtive movements inside car); United States v. Roper, 702 F.2d 984, 988 (11th Cir.1983) (officers' direction that two passengers exit vehicle, and initial officer's drawing his gun, not unreasonable).

United States v. Kapperman,  764 F.2d 786, 791 n. 4 (11th Cir. 1985).  In Courson v. McMillian, 939 F.2d 1479 (11th Cir. 1991), the court found no unreasonable use of force where persons suspected of drug activity were ordered to lie on the ground and the officer displayed a weapon. In fact, the court stated that "[i]n the middle of the night, it is not unusual for a law enforcement officer to have his weapon drawn, when approaching individuals suspected of drug involvement."  Id. at 1496.

In this case, there is evidence that Harrison was considered to be dangerous.  Defendants' Exhibit 3.  Law enforcement had been provided information that the Plaintiffs were going to engage in a drug deal on the day in question, and as the officers followed the car that night, the car in which the Plaintiffs were passengers appeared initially to be following a route consistent with the informant's information.  The police observed what they thought to be a diversion from the planned route as an attempt to evade the police officers and, therefore, conducted a stop at that point out of fear for the safety of their informant.  Defendants' Exhibit 3 at pages 2-3. Harrison also initially resisted the officers' orders to lie on the ground.  Taking all of the facts together, in a light most favorable to the non-movants, there is evidence that the officers had a reasonable suspicion that a serious crime was occurring, there was reason to believe the officers' safety and Greene's safety was at risk, and there was some evidence that at least one of the suspects had resisted the officers at the scene.  Therefore, the court cannot conclude that the Plaintiffs have demonstrated that the force used in securing the Plaintiffs during the stop was unreasonable.

Alternatively, the court concludes that a reasonable police officer would not have known that his actions violated clearly established rights.  "[A] minimal amount of force and injury . . .

will not defeat an officer's qualified immunity in an excessive force case." <u>Nolin v. Isbell</u>, 207

F.3d 1253, 1259 (11th Cir. 2000). There were no physical injuries as a result of this stop, and

the only injury pointed to by the Plaintiffs is an exacerbation of a mental disorder on the part of

Harrison. The evidence of Harrison's mental disorder is taken from Harrison's deposition in

which he states he had mental problems before October 2003, but they got worse so that now he

does not trust family members because he got "scared and scared." Defendants' Exhibit 1 at

page 25. There is no evidence that the officers involved knew of Harrison's mental disorder.

"What would ordinarily be considered reasonable force does not become excessive force when

the force aggravates (however severely) a pre-existing condition the extent of which was

unknown to the officer at the time." <u>Rodriquez v. Farrell</u>, 280 F.3d 1341, 1353 (11th Cir. 2002).

Summary judgment is, therefore, due to be GRANTED as to the excessive force claim on the

alternative grounds that any constitutional violation was not clearly established.

b.  January 2004 Rack Room Incident

Again, it appears that the Plaintiffs have asserted both unlawful seizure and unlawful use

of force claims based on the Rack Room incident.

Unlawful Seizure

The Plaintiffs' argument in their brief is that Harrison was not driving a vehicle but was

stopped while running to his vehicle and that this stop violated his constitutional rights. This

claim is not supported by the evidence, however, because it is not consistent with the undisputed

testimony given by Harrison in his deposition. Harrison stated that he ran to his vehicle, "and

once we get in the car," a Tahoe tried to block him in, but he went forward, and then "kept

going." Defendants' Exhibit 1 at page 121-22. It was only after he was driving that they "put

14

the lights on me." Id. at page 122: 9-10.  Therefore, the evidence is that Harrison was driving

when he was stopped, and the unsupported argument advanced in the Plaintiffs' brief that he was

on foot when he was stopped does not establish a constitutional violation.[7]

    A law enforcement officer "may stop a vehicle 'when there is ... probable cause to believe

that a driver is violating any one of the multitude of applicable traffic and equipment regulations'

relating to the operation of motor vehicles." United States v. Strickland, 902 F.2d 937, 940 (11th

Cir. 1990).  In this case, Harrison admits that he did not have a driver's license and offers no

evidence to dispute that the Defendants were aware that he did not have a license.  Defendants'

Exhibit 3 at page 3.  Accordingly, the court concludes that the stop of Harrison was lawful.

    The Plaintiffs may also be arguing that the stop was unlawful because, according to his

version of the events, the officers inquired about the presence of money and guns once Harrison

had been stopped.  The Eleventh Circuit has explained, however, that it is unreasonable

extensions of the duration of a detention and not the scope of the conversation during the

detention that could render an otherwise justified detention unreasonable.  United States v.

Hernandez, 418 F.3d at 1206, 1209 n.3 (11th Cir. 2005).  Although no evidence has been

presented as to the length of the stop,[8] the Plaintiffs have not argued that the duration of the

detention in this case exceeded that which is permissible.  In addition, a traffic stop may not last

"any longer than necessary to process the traffic violation" unless there is articulable suspicion of

---

[7] Even the recitation of the facts in the Plaintiffs' brief, unsupported by the evidence, is inconsistent with the Plaintiffs' argument because it states that the officers ordered Harrison to "get out of the car," Plaintiffs' Memorandum at page 3, not that the officers stopped Harrison while he was running to the car.

[8] The Defendants cite to evidence for the proposition that the detention lasted only a few minutes, but the evidence cited does not present testimony as to the length of the stop.

other illegal activity. United States v. Holloman, 113 F.3d 192, 196 (11th Cir.1997).  In this case, given Little's testimony that Harrison was evasive, which is consistent with Harrison's account of the events that he evaded the Tahoe and drove over a median, the court cannot conclude from the evidence presented that the stop at issue exceeded the scope of what is permissible when there is an articulable suspicion of other illegal activity.

Alternatively, the court concludes that if the stop exceeded the scope of what is permissible, the officers are entitled to qualified immunity because they had arguable reasonable suspicion of illegal activity other than the traffic violation.

Unlawful Force

The Plaintiffs assert that the officers engaged in an excessive use of force.  Accepting Harrison's version of the events in question, he was stopped, questioned, and guns were drawn at him in the presence of a woman he has referred to as his common law wife and her son.  The Defendants have argued that even accepting as fact that weapons were drawn, which they dispute, that fact does not constitute an unlawful use of force.

To balance the necessity of the force used against a detainee's constitutional rights, a court must evaluate several factors, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  Vinyard v. Wilson  311 F.3d 1340, 1347 (11th Cir. 2002).  The Eleventh Circuit has concluded that displaying a weapon during a Terry stop is not an unreasonable use of force where an officer has reason to be concerned for his safety. Courson v. McMillian, 939 F.2d 1479, 1496 (11th Cir. 1991).   As stated by the Eleventh Circuit, "an officer's drawing a weapon . . .  does not necessarily

16

constitute excessive force during an investigatory stop." <u>Jackson v. Sauls</u>, 206 F.3d 1156, 1171 -1172 (11th Cir. 2000).

In this case, Little testified in his affidavit that in 2003, Harrison was "known to be dangerous." Defendants' Exhibit 3 at page 2. Therefore, while the crime for which Harrison was being stopped was not severe, this situation presented more than just a typical traffic violation stop, and involved a possible threat to the safety of the officer. The court concludes, therefore, that drawing a weapon under these circumstances was not unreasonable. Even if there was a constitutional violation, however, the officers are entitled to qualified immunity because a reasonable officer could conclude, under <u>Courson</u> and other Eleventh Circuit precedent, that it is not clearly established that there is a constitutional violation when guns are displayed during a stop of a person considered to be dangerous.

### c. February 2004 Alice Lane incident

As with the previously discussed incidents, the Plaintiffs appear to assert both unlawful seizure and unlawful use of force claims based on the Alice Lane incident.

### Unlawful Seizure

The Plaintiffs' theory that the detention of Richard was unlawful appears to be that the person who informed the police that Richard was involved in shooting into an officer's house was himself a likely sniper suspect. The Plaintiffs do not address the facts that Richard had an outstanding felony arrest warrant or that he evaded law enforcement officers' attempts to stop him, however. Based on the undisputed facts, the court cannot conclude that the stop, whether viewed as an arrest pursuant to the warrant or a stop of based on reasonable suspicion of criminal activity based on the informant's information and Richard's evasive actions, was unlawful.

17

Unlawful Use of Force

The Plaintiffs contend that Richard's life was placed in jeopardy, apparently referring to Richard's testimony that shots were fired.  As the Defendants point out, however, Richard did not know what kind of weapon was shot. Defendants' Exhibit 2 at page 27: 12-14.   The Defendants, on the other hand, have presented affirmative evidence that the weapon was an air rifle used to shoot chemical spray into the air.  Defendants' Exhibit 4 at page 1.

During this incident, the crimes for which the stop was conducted, a shooting into an officer's home and intimidation of a witness, were severe; Richard was considered to be armed and dangerous, Defendants' Exhibit 4 at page 1; and Richard attempted to evade detention by flight.  See Vinyard v. Wilson  311 F.3d 1340, 1347 (11th Cir. 2002).   The court concludes, therefore, that the mere firing of chemical spray from an air rifle was not unreasonable force in this case. See id. at 1348 ("Courts have consistently concluded that using pepper spray is reasonable, however, where the plaintiff was either resisting arrest or refusing police requests . . . .").

Additionally, in the Eleventh Circuit, if there is a lawful seizure, "a minimal amount of force and injury  . . . will not defeat an officer's qualified immunity in an excessive force case." Nolin v. Isbell, 207, F.3d 1253, 1258 (11th Cir. 2000).   Richard does not contend that he was affected by the chemical spray in any way, much less that he suffered any injury as a result of the use of this air rifle.  Therefore, even if there was a constitutional violation, the officers are entitled to qualified immunity for using the air rifle.

The Plaintiffs also provide evidence that an officer Williams pushed Richard's face to the ground and caused the back of some of Richard's teeth to be broken.  Defendants' Exhibit 4 at

18

page 27:22-23.  Williams is not a defendant in this case.

In the Eleventh Circuit, an officer who is present at the scene where force is used can be held liable for another officer's excessive use of force.  Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996).   To establish liability under such a theory, however, a plaintiff must demonstrate that the officer failed to take reasonable steps to protect the victim of another officer's use of excessive force.  Id.  In Riley, one officer's gun discharged while the other officer was on the opposite side of a vehicle.  The court concluded that there was no evidence that the officer on the opposite side of the vehicle had reason to expect the use of excessive force until after it occurred.  Id.; see also Martin v. Anderson, 107 F. Supp. 2d 1342 (M.D. Ala. 1999) (no excessive force claim established where one officer kicked the suspect only once and other officer at the scene had no warning that the officer was going to kick the suspect).

In this case, the only evidence before the court is that an officer who is not a defendant in this case, Williams, pushed Richard's face to the pavement.  Even assuming that Williams' use of force was excessive, there is no evidence that Townson or Little were present when the force was applied, were aware that excessive force would be used, or had a reasonable opportunity to intervene.  Accordingly, summary judgment is due to be GRANTED as to this claim.


### 2.  Claims Against the City of Prattville

Because there were no Fourth Amendment violations during any of the three incidents which form the basis of the Complaint in this case, there is no basis for holding the City of Prattville liable for Fourth Amendment violations, and summary judgment is due to be GRANTED as to the City of Prattville and the defendants in their official capacities on the

Fourth Amendment claims brought in this case.

Even assuming that the actions of Little and Townson violated Smith and Harrison's constitutional rights, however, the Plaintiffs must demonstrate that the City of Prattville can be held liable for any violation of their rights.

A municipality cannot be held liable under respondeat superior for constitutional violations committed by its agent.  Monell v.  Dept. of Social Servs., 436 U.S. 658, 691-92 ( 1978).  Instead, there must be a showing of a policy or custom which was the moving force behind the constitutional injury. Id. at 694.

To establish municipal liability, the Plaintiffs have argued that their rights were violated pursuant to a policy or custom of the City of Prattville because Townson and Little were not trained on "how to police a diverse population."  Plaintiffs' Memorandum at page 6.   Therefore, to establish municipal liability, the Plaintiffs must demonstrate that (1) the government inadequately trained its employees, (2) the failure to train is an official policy, (3) the policy caused the employees to violate the plaintiff's rights. Thomas v. Roberts, 261 F.3d 1160 (11th Cir. 2001).

The Plaintiffs have argued that although Little and Townson were adequately trained in narcotics issues, they had inadequate training in diversity and sensitivity.  Plaintiffs' Memorandum at page 3.  The Plaintiffs have pointed to the training records of the two officers, stating that Townson received two hours of relevant course work and Little did not participate in any relevant course work.  This evidence of training, however, does not create a question of fact as to whether the City's training program was inadequate, or whether a failure to adequately train in diversity and sensitivity caused the violations of Plaintiffs' rights.  The Plaintiffs also state

that the Mayor and Police Chief were given notice of the incidents at issue.  The Plaintiffs have not demonstrated, however, that notice of these incidents would alert the City of Prattville that diversity and sensitivity training was needed to avoid constitutional deprivations.  Accordingly, on this alternative basis, the City of Prattville is entitled to summary judgment on the Fourth Amendment claims.  In addition, with respect to the unlawful use of force claim based on Williams' actions during the Alice Lane incident, the Plaintiffs have presented no evidence of any policy or custom regarding the actions of Williams, who is not a defendant in this case. Summary judgment is, therefore, also due to be GRANTED as to the City of Prattville on the claims asserted based on the Alice Lane incident on this alternative basis as well.

### B.  Fourteenth Amendment

The Plaintiffs have asserted that the three incidents which form the basis of their Fourth Amendment claims also violated their rights to equal protection under the Fourteenth Amendment.

Equal protection claims can be divided into three broad categories:  a claim that a statute discriminates on its face, a claim that neutral application of a facially neutral statute has a disparate impact, and a claim that defendants are unequally administering a facially neutral statute. E & T Realty v. Strickland, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987).   Apparently, the Plaintiffs contend that their claim in this case falls into the third category.  In order to establish a claim based upon the application of a facially neutral statute, the plaintiff must first establish that he or she was treated differently than similarly situated persons.  Powell v. City of Montgomery, 56 F. Supp. 2d 1328, 1332 (M.D. Ala. 1999) (citing Strickland v. Alderman, 74 F.3d 260, 264

(11th Cir.1996)).  "Second, it must be established that the defendant unequally applied the facially neutral statute "for the purpose of discriminating against the plaintiff.'" Id.

The Defendants have moved for summary judgment on the basis that the Plaintiffs have not created a question of fact as to whether any similarly situated persons who are not of the Plaintiffs' race have been treated differently.

The Plaintiffs have responded to the Motion for Summary Judgment by arguing that they are not required to prove their claims at this stage in the proceedings.  The Plaintiffs state that the allegations of their Complaint allow for the inference of discrimination.  Once the moving party has met its burden, however, Rule 56(e) "requires the nonmoving party to go beyond the pleadings," in demonstrating that there is a question of fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

The Plaintiffs have cited authority for the proposition that it is not enough for the summary judgment movant to simply assert that the non-movant will not be able to meet its burden at trial.  The law in the Eleventh Circuit on this point is as follows:

> Celotex simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. Even after Celotex it is never enough simply to state that the non-moving party cannot meet its burden at trial.

Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Although it is not entirely clear what the Plaintiffs' theory of an equal protection claim is, the Defendants' view of their claim, which the Plaintiffs' have not disputed, is that they contend that they have not been allowed to participate as informants, and avoid prosecution, as white persons have been.  The Defendants have presented evidence that the Plaintiffs were given

22

opportunities to work as informants, Defendants' Exhibit 2, page 92: 8-23,[9] as were white individuals, and have stated that there is no evidence in the record that white individuals similarly situated to the Plaintiffs were treated differently.

In response to the Defendants' assertion of the defense of qualified immunity, the Plaintiffs have stated that there is evidence of intent to discriminate on the basis of race, including a statement by Townson that he had never had a physical altercation with any of the Plaintiffs, and a statement by Little that he had never used a white informant in the prosecution of the Plaintiffs, even though Plaintiffs Harrison and Smith were arrested on charges using a white informant. This evidence does not, however, establish that similarly situated persons of a different race were treated differently. By failing to point to a similarly situated person who was treated differently, the Plaintiffs have failed to meet their burden in light of the Defendants' having pointed the court to evidence that the Plaintiffs were not treated less favorably than white persons, and having stated that there is no record evidence to the contrary.

Another possible basis for claiming an equal protection violation is the assertion that white persons are stopped less frequently than black persons. The evidence pointed to by the Plaintiffs to support such a theory is that in their answers to interrogatories, Townson and Little state that although they have stopped, arrested, and put under surveillance white suspects, they cannot provide concrete statistics as to the numbers of persons stopped because the City of

---

[9] Although the Defendants have cited to various excerpts from all three of the Plaintiffs' depositions, only this deposition excerpt has been provided to the court. In any event, the Defendants have adequately moved for summary judgment as to the claims of all three Plaintiffs by pointing out to the court that there is no evidence that white persons were allowed to work as informants but the Plaintiffs were not. The Plaintiffs have failed to provide evidence to create a question of fact on this element of their claim.

Prattville does not keep those statistics.  The court cannot conclude that such evidence is sufficient to create a question of fact as to whether similarly situated persons are treated differently.

Accordingly, summary judgment is due to be granted as to the equal protection claims as to all defendants.

## C.  First Amendment

The Defendants have moved for summary judgment on the Plaintiffs' First Amendment claims, stating that the First Amendment has no applicability in this case.  The Plaintiffs respond that they have rights of association and travel which have been violated.

The constitutional right to travel "protects interstate travelers against two sets of burdens: 'the erection of actual barriers to interstate movement' and 'being treated differently' from intrastate travelers." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 277 (1993).  Therefore, the Plaintiffs have failed to present any evidence that either of those burdens exist in this case.  There is no evidence that the Plaintiffs were interstate travelers.

The First Amendment right of association has been recognized in two instances, one of which is a protection as a fundamental element of personal liberty.  Roberts v. U.S. Jaycees, 468 U.S. 609, 617-618 (1984).  The Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State.  Id. "At a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family--[specifically] marriage . . . ." Chesser v. Sparks, 248 F.3d 1117, 1124 (11th Cir. 2001).  A plaintiff "can obtain special protection for an asserted associational right if she can demonstrate either that the asserted association closely enough

resembles a family relationship to be protected by the right to intimate association, or that the purpose of the association is to engage in activities independently protected by the First Amendment." McCabe v. Sharrett, 12 F.3d 1558, 1563 (11th Cir. 1994).

In this case, the Plaintiffs state that their criminal history indicates that they are unable to assemble without being harassed by the Defendants. The Plaintiffs have cited to deposition testimony that the Plaintiffs are stopped by police officers when they drive together. They have also cited to other evidence, such as Smith's deposition testimony that during the Meharry Street stop Little said he had told Smith about "hanging out with Mr. Harrison." Defendants' Exhibit 10 at page 44:15-18. The court cannot conclude that the evidence cited, when viewed in a light most favorable to the non-movants is sufficient to establish undue state intrusion or to establish the type of intimate relationship which is protected by the First Amendment.[10] Summary judgment is, therefore, due to be GRANTED on the First Amendment claims.

<u>State Law Claims</u>

A.  Claims Against Defendants Little and Townson in Their Individual Capacities

From the face of the Complaint, it appears that the officers who have been named as defendants have only been sued in their official capacities. The Defendants, however, have moved for summary judgment on the basis of discretionary function immunity for Townson and Little in their individual capacities. The Defendants contend that the officers are entitled to immunity because they were engaged in discretionary acts and there is no evidence that their acts were willful, malicious, or taken in bad faith.

---

[10] Alternatively, the court concludes that it is not clearly established that conducting traffic stops violates First Amendment association rights, and that the Plaintiffs have failed to demonstrate any policy or custom which was a moving force for such a constitutional violation.

In Alabama, law enforcement officers enjoy statutory immunity from suit for the "performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5- 338.  Qualified immunity under federal law and state-function immunity under Alabama law are not identical because federal immunity employs an objective, reasonable-officer standard, while state immunity is a subjective inquiry into what the defendant officers actually believed.  See Scarbrough v. Myles, 245 F.3d 1299, 1303 n. 9 (11th Cir. 2001).  "Under discretionary-function-immunity analysis, a court first determines whether the government defendant was performing a discretionary function when the alleged wrong occurred; if so, 'the burden shifts to the plaintiff to demonstrate that the defendant[ ] acted in bad faith, with malice or willfulness in order to deny [him] immunity.' " Wood v. Kesler  323 F.3d 872, 883 (11th Cir. 2003) (citations omitted).  There is apparently no dispute that the officers were performing discretionary functions during the incidents at issue.

The evidence presented fails to create a question of fact as to the lawfulness of each of the detentions by law enforcement at issue.  There also is no question of fact as to the lawfulness of the force used in effectuating these lawful detentions.  Therefore, the evidence before the court when viewed in a light most favorable to the non-movants also does not create a question of fact as to willfulness, maliciousness, or bad faith on the part of the officers, as recognized under Alabama law.  See, e.g., Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 174 (Ala.2000) (malice "may be inferred from a lack of probable cause or from mere wantonness or carelessness if the actor, when doing the act, knows it to be wrong or unlawful").  Accordingly, summary judgment is due to be GRANTED as to the individual officers on the state law claims.

B. Claims Against the City of Prattville

The Defendants contend that they are entitled to summary judgment on the Plaintiffs' state law claims against the City of Prattville because the Plaintiffs failed to satisfy the statutory requirements for asserting claims against a municipality.

Under Alabama Code § 11-47-23 a claimant must notify the City Clerk of potential claims of municipal liability. Under Alabama Code § 11-47-192, a sworn statement must be filed with the City Clerk before relief can be awarded. If a plaintiff does not file a sworn statement of a claim within six months of the claim, the plaintiff's claim will be dismissed. See Poe v. Grove Hill Mem. Hosp. Bd., 441 So. 2d 861 (Ala. 1983). The Defendants attach a letter filed with the City of Prattville, and state that because this letter, not a sworn statement, was all that was filed, the statutory requirements were not met.

The Plaintiffs respond merely by referring to the evidence provided by the Defendants and have not provided any evidence that a sworn notice of claim was provided to the City of Prattville. The Plaintiffs state that the City of Prattville accepted notice of the claim and began discussions after receipt of the notice. The Plaintiffs have not cited to, and the court is not aware of, any authority for the proposition that the requirement of a sworn statement is waived if the City accepts receipt of an unsworn notice of claim. Accordingly, summary judgment is due to be GRANTED as to the City of Prattville and the defendants in their official capacities on the state law claims.

## V. CONCLUSION

For the reasons discussed, the Defendants' Motion for Summary Judgment is due to be and is hereby ORDERED GRANTED. A Final Judgment will be entered in accordance with this Memorandum Opinion and Order.

Done this 28th day of October, 2005.

/s/ W. Harold Albritton
W.  HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE